### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF NEW MEXICO

BRIAN H. MARCH,

      Plaintiff,

  -vs-                                                               No. CIV 98-0918 LH/JHG

WILLIAM J. HENDERSON, Postmaster General,
United States Postal Service,

      Defendant.

### MEMORANDUM OPINION

**THIS MATTER** comes before the Court on Defendant's Motion for Summary Judgment (Docket No. 33), filed July 7, 2000.  The Court, having reviewed the Motion, the accompanying memoranda, and the applicable law, having heard oral argument on November 1, 2000, and otherwise being fully advised, finds that the Motion is well taken in part and will be **granted in part** and **this action will be dismissed**.

I

Summary judgment may properly be granted if there are no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Pleadings and documentary evidence must be liberally construed in favor of the nonmoving party.  *Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1379 (10th Cir. 1994).  If the moving party satisfies its initial burden demonstrating the absence of any genuine issue of material fact, the nonmoving party must identify sufficient evidence requiring submission of the case to a jury.  *Id.*

II

Plaintiff Brian March has been employed by the United States Postal Service (Postal Service or USPS) since he was hired under its Handicapped Program in 1986. He has congenital nystagmus, an incurable nervous condition that causes involuntary rapid and jerky lateral movement of his eyes in opposite directions, adversely affecting his visual acuity.

Up until May of 1997 Mr. March worked at a sorting machine at the Processing and Distribution Center (the Plant). On May 6, 1997, his optometrist, Dr. Schauer, wrote a letter to a manager at the Plant explaining that the dry, dusty conditions generated there by the increasing numbers of automated equipment caused intolerable irritation to Mr. March's eyes. While Plaintiff's vision is 20/400 untreated, he has achieved optimum correction since 1984 by using rigid gas permeable contact lenses. In his letter Dr. Schauer reported that Plaintiff's distance visual acuity was 20/40 in the right eye, 20/50 in the left eye, and 20/30 for both eyes at near vision, but that "the irritation increas[ed] his visual acuity decreases [sic]." According to Mr. March, he felt as if he had rocks in his eyes and his vision became so hazy because of the irritation that he would become dizzy and lose his balance, causing him to fear injury to himself and others. None of the remedial steps Plaintiff took under his doctor's guidance alleviated the problem and Dr. Schauer recommended that Mr. March be immediately and permanently moved out of any area of the Plant.

The following day Plaintiff filed for compensation with the Office of Workers' Compensation Programs (OWCP), claiming injury to his eyes from working at the Plant and requesting a light duty assignment outside the Plant. The Postal Service reassigned Plaintiff to work at a mail sorting machine at another station, where he worked from May 8th to September 19th. On July 24th the OWCP accepted Plaintiff's claim for temporary aggravation of his eye condition.

2

On September 17, 1997, John Stout, Plaintiff's immediate supervisor, directed him to return to the Plant on September 20th, initiating the events that have led to this suit. Supervisors apparently thought Plaintiff's medical restrictions could now be met through his use of goggles and proposed changes in maintenance schedules and methods of servicing the machinery. In any case, they were very concerned that the OWCP ruling in favor of Mr. March would result in a flood of requests by other employees for reassignment from the Plant because of dust irritation. Plaintiff never did report back to the Plant. Instead, he filed a grievance on September 18, 1997, alleging violation of his medical restrictions by reassignment to the Plant. This grievance was "partially resolved" on October 15, 1997. Pursuant to that agreement, management was to place Mr. March in work status from September 18th until the date he returned to work, with payment of all lost wages and leave and retention of seniority. Additionally, the Postal Service agreed make every effort to find Plaintiff a position within his medical restrictions. Plaintiff, however, did not receive interest on wages and medical expenses or time and transportation expenses and his claims of harassment and discrimination were denied.

On October 15th Mr. Stout informed Plaintiff by letter that he was temporarily assigned to the Air Mail Facility (AMF). Letters concerning the working conditions there were exchanged and Plaintiff advised Mr. Stout that he had made appointments with his eye and back doctors and he requested a detailed job description for their assessment. On October 31, 1997, a "Fact Finding" was held on why Plaintiff had not yet reported to work at the AMF. At that meeting Mr. March and his representative, the local union president, agreed that Plaintiff would begin work at the AMF the next day. Certain accommodations were to be afforded to allow Plaintiff to perform his work functions, and he also was to be compensated for all lost wages incurred from October 18 through October 31,

1997, and all charges of AWOL would be rescinded. Mr. Stout notified the AMF supervisor that Mr. March was to report for duty at noon on November 1st and that his medical restrictions included no continuous lifting over twenty pounds or intermittent lifting over thirty-five pounds, no dust due to his contact lenses, and that steps would need to be taken to insure he was not in danger of being struck by parcels thrown by other workers if, because of his sight, he needed to walk around the sack racks to distribute mail.

On November 1st, Plaintiff initially called in sick, but later reported for work, leaving, however, after about three and a half hours. He apparently had difficulty in reading some labels and felt humiliated by several derogatory comments made to him by several coworkers. On November 4th Plaintiff's psychiatrist, Dr. Seeger, recommended a thirty-day medical leave due to stress. She eventually diagnosed Plaintiff as suffering from Post Traumatic Stress Disorder (PTSD). Dr. Seeger continued to diagnose Plaintiff as being incapable of work well into 1999.

On November 12, 1997, Mr. Stout sent Plaintiff a Letter of Warning and again charged him as AWOL from October 18 through the 31st. On November 13, 1997, Plaintiff filed a second grievance, which was settled in full on May 7, 1998. In the settlement the parties agreed that there had been a breakdown of communication regarding the original settlement of October 15, 1997, and Plaintiff's reassignment to the AMF. Accordingly, the USPS purged the Letter of Warning from Plaintiff's record, converted the AWOL to administrative leave, and compensated Mr. March for the period of October 18-31, 1997.

On November 8 and December 18, 1997, Plaintiff filed complaints with the USPS Equal Employment Office (EEO). In the November complaint he alleged failure to reasonably

accommodate his physical disabilities regarding his eyes. The December complaint apparently was for retaliation in denying Plaintiff reasonable accommodation, charging AWOL, forcing temporary assignment to a job contrary to his medical restrictions, and issuance of the Letter of Warning. In December 1999 Mr. March returned to work with the USPS as a window clerk at yet another location.

III

Plaintiff brought suit on July 31, 1998, for discrimination and retaliation in violation of the Rehabilitation Act , 29 U.S.C. §§ 791, *et seq.*, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e), *et seq.* He maintains that he suffers and has suffered from depression, congenital nystagmus, and degenerative back disease. In Count I Plaintiff alleges that he is substantially limited in the activities of seeing and working and is perceived by the USPS as a handicapped individual. He charges that Defendant refused to reasonably accommodate him with light duty and/or limited duty work. He further claims adverse employment actions and that he has been forced into leave-without-pay status by Defendant's refusal of light duty/limited duty work within his restrictions and reassignment. In Count II, his retaliation claim, Plaintiff alleges a pattern of behavior aimed at intimidating and coercing him to return to work in violation of his medical restrictions, bad faith negotiations and failure to abide by agreements, and allowing coworkers to ridicule and insult him because of his handicap.

Defendant moves for summary judgment on both counts. He first argues that Plaintiff is not disabled within the meaning of the Rehabilitation Act because his ability to see is not substantially

impaired, he is not substantially limited from working, and he is not regarded as disabled.  Defendant also contends that Plaintiff refused to assist the USPS in determining a reasonable accommodation, and that he cannot state a cause of action of retaliation.

At the motion hearing held November 1, 2000, the parties stipulated on the record that Plaintiff's back condition is not a disability under the Rehabilitation Act.  Additionally, in response to the Court's inquiry, Plaintiff conceded that he did not assert mental or psychological impairment in either of his EEO filings, thereby failing to exhaust his administrative remedies to such a claim and leaving the Court without jurisdiction to hear it.  *See Belhomme v. Widnall*, 127 F.3d 1214, 1216 & n.1 (10th Cir. 1997)(failure to timely file administrative complaint is prerequisite, if not jurisdictional bar, to bringing suit in federal court); *Jones v. Runyon*, 91 F.3d 1398, 1399 n.1 (10th Cir. 1996)("[O]ur court has referred to the requirement of an EEOC filing (as opposed to a mere requirement of a timely filing) as a jurisdictional requirement."); *Khader v. Aspin*, 1 F.3d 968 (10th Cir.1993).

A

The Rehabilitation Act (the Act) provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, . . . be subjected to discrimination under any program or activity conducted . . . by the United States Postal Service."  29 U.S.C. § 794(a). Thus, the USPS "shall make reasonable accommodation to the known physical . . . limitations of an . . . employee who is a qualified individual with handicaps unless the agency can demonstrate that the accommodation would impose an undue hardship on the operations of its programs."  29 C.F.R. § 1614.203(C)(1).

6

In order to establish a prima facie case under the Act, a plaintiff must show that 1) he is a disabled person within the meaning of the Act; 2) he is otherwise qualified for the job; and 3) he was discriminated against because of his disability. *See Woodman v. Runyon*, 132 F.3d 1330, 1338 (10th Cir. 1997). This is the same test that is used for actions brought under the Americans with Disabilities Act (ADA), and the standards and cases decided under the ADA apply to cases brought under the Rehabilitation Act. *See id.* 1339 n.8; 29 U.S.C. § 791(g); *Doyal v. Oklahoma Heart, Inc.*, 213 F.3d 492, 495 (10th Cir. 2000)(to prevail on discrimination claim plaintiff must establish that she is 1) disabled person as defined by ADA, 2) qualified, with or without reasonable accommodation, and 3) employer discriminated against her because of her disability).

1

Defendant first questions whether Plaintiff is an individual with a disability. Under the Act, the term "disability" means "a physical . . . impairment that substantially limits one or more major life activities." 29 U.S.C. § 705(9)(B). A physiological disorder or condition affecting special sense organs is a physical impairment. 29 C.F.R. § 1614.203(a)(2)(i). The term "individual with a disability" means

> . . . any person who—
>    (i)  has a physical or mental impairment which substantially limits one or more of such person's major life activities;
>    (ii)  has a record of such an impairment; or
>    (iii)  is regarded as having such an impairment.

29 U.S.C. § 705(20)(B). "Major life activities" include "functions, such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1614.203(a)(3).

The parties do not dispute that congenital nystagmus is a physical impairment within the meaning of the Act, nor that seeing and working are among Plaintiff's major life activities. The issue rather is whether congenital nystagmus "substantially limits" Plaintiff's seeing or working. Under the ADA regulations, "substantially limits" is defined as

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The regulations additionally enumerate three factors that "'should be considered' when determining whether an impairment substantially limits a major life activity . . . : '(i) [t]he nature and severity of the impairment; (ii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir. 1994)(quoting 29 C.F.R. § 1630.2(j)(2)).

While not an onerous burden, those claiming the Act's protection must prove their disability "by offering evidence that the extent of the limitation in terms of their own experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999). Additionally, the effects of corrective measures, both positive and negative, are to be taken into account when determining whether the person is "substantially limited" in a major life activity and thus "disabled" under the Act. *Sutton v. United Air Lines, Inc*., 527 U.S. 471, 482 (1999). The determination, then, "depends on whether the limitations an individual with an impairment *actually* faces are in fact substantially limiting." *Id.* at 488.

The parties expend considerable effort attempting to establish what Mr. March's visual acuity readings were on various dates. Although Dr. Schauer's records are somewhat confusing, in his May 6, 1997, letter he reported that Mr. March's visual acuity was 20/40 in the right eye, 20/50 in the left eye, and 20/30 for both eyes at near distance. He also recorded a 20/30 reading for binocular correction in 1997, which he felt was consistent with his other findings. On August 13, 1998, Dr. Farnath examined Plaintiff and found his best visual acuity to be 20/50 in each eye.

Clearly, Plaintiff's corrected vision with glasses was worse than correction with rigid gas permeable lenses and even with contact lenses his visual acuity varied to some extent and was detrimentally affected by the acute dust irritation he experienced at the Plant. Absent that aggravation, however, as Dr. Schauer related in his June 29, 1998, letter to Gordon Reiselt, Plaintiff's reduced visual acuity associated with the nystagmus would not be expected to change, for the better or worse, throughout his lifetime. Additionally, the extreme effects of dust irritation were limited to Plaintiff's working at the Plant, and he reported a 95% reduction in eye aggravation to Dr. Schauer in early November 1997. In any event, these measures are of little value to the Court in determining the extent of Plaintiff's visual limitations with regard to the standards established by the Rehabilitation Act. *See Ditullio v. Vill. of Massena*, 81 F. Supp. 2d 397, 404 (N.D.N.Y. 2000)(court not to look at mathematical averages, numerical categorizations to find whether particular impairment constitutes per se disability; must make individualized inquiry)(citing *Sutton*, 119 S. Ct. at 2147; 29 C.F.R. § pt 1630, App. §1630.2(j)). The same is true of the bare fact that Plaintiff was hired under a USPS handicapped program because of his congenital nystagmus.

9

In his Statement of Supplemental Material Facts Plaintiff claims that his condition precludes him from reading newsprint and fine print and that he has never read an entire newspaper article in his life. None of these assertions is supported by his Affidavit. In fact, Dr. Schauer testified at his deposition that with 20/30 vision one can read a newspaper and with magnification, such as a pair of reading glasses that can be bought at a drugstore, read the phone book. Plaintiff appears to support Dr. Schauer's testimony by asserting in his Statement of Disputed Material Facts that he cannot read newsprint or write without magnification beyond the correction provided by his contact lenses. Dr Schauer also stated that Plaintiff can go to the movies and watch television. While Dr. Farnath did write in her September 2, 1998, letter regarding Plaintiff's fitness for duty that small print was impossible for him to read, it is unclear whether this is with or without correction by magnification.

Driving was the most outstanding, and only, limitation in day-to-day life that Dr. Schauer attributed to Plaintiff's condition. Mr. March confirms in his affidavit that he has not driven a car for twenty-two years because he cannot focus on the car mirrors and is unable to judge the position of the vehicle on the road moving from left to right. These difficulties, however, apparently do not preclude his driving a motorcycle about 1,200 miles a year. Dr. Schauer confirmed that he had approved Mr. March for driving at one point when his vision was 20/40, the visual acuity required by law, and told him he could not drive another time when his vision was less than 20/40. In sum, Dr. Schauer agreed the conclusion of Plaintiff's ophthalmologist that Mr. March is capable of performing fairly well visually.

On the basis of this record, the Court cannot find that Plaintiff has met his burden to show that congenital nystagmus substantially limits his major life activity of seeing. As the district court

10

noted in *Bancale v. Cox Lumber Co.*, in most ADA cases where a plaintiff suffers from some form of visual impairment, but still is able to perform most daily activities without much difficulty, he or she has been found not to be disabled under ADA. 1998 WL 469863, at *4 (M.D. Fla. May 18, 1998) (comparing numerous cases so finding, with the cases finding otherwise all based on uncorrected impairments); *see also, e.g., Ditullio*, 81 F. Supp. 2d at 405-06 (same); *Pacella v. Tufts Univ. Sch. Dental Med.*, 66 F. Supp. 2d 234 (D. Mass. 1999).

2

To establish a substantial limitation in the major life activity of working, Plaintiff must show, at a minimum, that he is unable to work in a broad class of jobs. *See Sutton*, 527 U.S. at 491. In regard to working, then, the EEOC has set forth a specialized definition of the term "substantially limits":

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(i)). In addition to the three factors that are to be considered in determining whether an impairment substantially limits any major life activity, *see* 29 C.F.R. § 1630.2(j)(2), three additional factors "may be considered" with regard to working:

> (A) The geographical area to which the individual has reasonable access;
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs, utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

§ 1630.2(j)(3)(ii); *Bolton*, 36 F.3d at 943. Thus, to be substantially limited in the major life activity of working, "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Sutton*, 527 U.S. at 492. Therefore, "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." *Id.*

There is no dispute that Plaintiff cannot work at any job at the Plant, as long as the dry and dusty conditions exist there. This fact alone, however, clearly is insufficient under the Act to establish that he is disabled with regard to working. Plaintiff agrees that an inability to perform a single, particular job does not constitute, as a matter of law, a substantial limitation in the major life activity of working. The Court finds that this also is true in this case with regard to Plaintiff's inability to perform any job under certain conditions at a particular location, such as the Plant.

The positions available to Mr. March with the Postal Service in this geographic area, and with other employers, were not and are not limited to the Plant. Thus, the various jobs Plaintiff lists in his affidavit that he is medically restricted from performing at the Plant and other Postal Service facilities is not particularly helpful. Additionally, Plaintiff provides no evidentiary support establishing that he actually is restricted from any of these positions. Neither does he explain how his visual restrictions, dry and dusty conditions and reading certain labels and small print, actually preclude him from these jobs.

Plaintiff also fails to address in any way the issues of his vocational training, the geographical area to which he has access, or the number and type of jobs demanding similar or dissimilar training from which he is disqualified. *See Bolton*, 36 F.2d at 944 (summary judgment affirmed where

12

plaintiff failed to address criteria set forth at 29 C.F.R. § 1630.2(j)(3)(ii)). Furthermore, the Court finds it significant that Plaintiff successfully performed at the Pino Station the very job that he was precluded from doing at the Plant and that he presently works as a window clerk for the PostalService, another of his listed precluded jobs. This employment strongly undermines any claim that Plaintiff is substantially limited in his ability to work. *See Sherman v. Peters*, 110 F. Supp. 2d 194, 200 & n.6 (W.D.N.Y. 2000); *Ditullio*, 81 F. Supp. 2d at 407.

3

Lastly, Plaintiff claims to be disabled under the Act because he was regarded by the Postal Service as having a physical impairment that substantially limits one or more of the major life activities. *See* 29 U.S.C. § 705(20)(B)(iii). An individual is regarded as having an impairment if he or she "has a physical . . . impairment that does not substantially limit major life activities, but is treated by an employer as constituting such a limitation; has a physical . . . impairment that substantially limits major life activities only as a result of the attitude of an employer toward such impairment; or has none of the impairments defined in [29 C.F.R. § 1614.203(a)(2)] but is treated by an employer as having such an impairment. § 1614.203(a)(5). Thus, "[a] person is 'regarded as having' an impairment that substantially limits the person's major life activities when other people treat that person as having a substantially limiting impairment. The focus is on the impairment's effect upon the attitudes of others." *MacDonald v. Delta Air Lines*, 94 F.3d 1437, 1444 (10th Cir. 1996)(*quoting Wooten v. Farmland Foods*, 58 F.3d 382, 385 (8th Cir.1995)(citation omitted)).

Plaintiff maintains the fact that he was hired under the USPS handicapped program and is listed on the hiring document as "severely handicapped" conclusively establish that Defendant

13

regarded him as being impaired. He also states that Defendant's occupation health nurse testified that a person hired under the handicapped program is considered to have a permanent disability.

The Court agrees with the Postal Service that Plaintiff has not created a genuine issue as to whether Defendant regarded him as impaired. Not only does he fail to cite any authority establishing that being hired under a handicapped program requires such a conclusion, but he also fails to provide any information whatsoever regarding the program and has not included any testimony in the record by the occupational nurse.

Furthermore, even if Plaintiff were to establish that he was disabled because the Postal Service regarded him as impaired, he would not be entitled accommodation. As the Eighth Circuit Court of Appeals has recognized, while "the application of the reasonable accommodation requirement is perfectly consistent with the ADA's goal of protecting individuals with disabling impairments who nonetheless can, with reasonable efforts on the part of their employers, perform the essential functions of their jobs[; it] makes considerably less sense in the perceived disability context [and] would lead to bizarre results." *Weber v. Strippit, Inc.*, 186 F.3d 907, 916 (1999). The court thus held "that 'regarded as' disabled plaintiffs are not entitled to reasonable accommodations." *Id.* at 917; *see also, e.g., Coleman v. Keebler Co.*, 997 F. Supp. 1102, 1119 (N.D. Ind. 1998)("logic dictates that if the evidence supports a regarded as theory of disability, the case must then proceed under a disparate treatment, not a reasonable accommodation, theory").

B

Defendant also moves for summary judgment on grounds that Mr. March refused to assist the Postal Service in determining a reasonable accommodation at the Plant and the AMF. In his reply brief Defendant expands this argument, maintaining that even if Plaintiff had a mental

14

disability under the Act, he was not "otherwise qualified" because according to Dr. Seeger he was totally disabled by depression or PTSD between November 1, 1997 and December 1999 and unable to work anywhere. At the motion hearing the parties engaged in considerable discussion on whether Dr. Seeger's diagnoses established that Plaintiff was not "otherwise qualified," regardless of the nature of his disability.

"The federal regulations implementing the ADA envision an interactive process that requires participation by both parties." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171 (10th Cir. 1999)(en banc)(*quoting Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998)(internal quotations omitted)). Thus, "both parties have an obligation to proceed in a reasonably interactive manner to determine whether the employee would be qualified, with or without reasonable accommodations, for another job within the company and, if so, to identify an appropriate reassignment opportunity if any is reasonably available." *Id.* at 1172. As a threshold, however, a plaintiff must be a "qualified individual with a disability," that is, "an individual with a disability who, with or without reasonable accommodation, *can perform the essential functions of the employment position that he holds or desires.*" *See id.* at 1161 (emphasis altered).

The Court finds that there are genuine issues of material fact as to whether Mr. March sufficiently interacted with the Postal Service in September and October regarding the positions at the Plant and the AMF. Factual issues also exist regarding the scope and effect of Dr. Seeger's diagnoses of Plaintiff's inability to work. While the Court is disinclined to consider Dr. Seeger's affidavit submitted in support of Plaintiff's response brief, which largely contradicts her earlier deposition testimony, the fact remains that the Postal Service itself apparently did not consider Plaintiff totally disabled between 1998 and 1999. For example, Defendant arranged for Plaintiff to

15

have a fitness-for-duty examination with Dr. Farnath on August 13, 1998. At about the same time a USPS supervisor requested Dr. Schauer's opinion on whether Mr. March could meet job duties for a possible position by reading certain labels. Also, in May 1999 a supervisor faxed information to Dr. Schauer concerning a limited duty assignment for Plaintiff as a mail processor at the Plant. Thus, summary judgment is not appropriate on whether Plaintiff sufficiently participated in the required interactive process or whether he was "otherwise qualified" because of his psychological condition.

C

Finally, Defendant moves for summary judgment on Plaintiff's Title VII retaliation claim. Plaintiff charges that after he filed his grievance and his EEO complaints, Defendant intimidated and coerced him to return to work in violation of his medical restrictions, engaged in bad faith negotiations by not abiding by verbal agreements made with Plaintiff and the union, engaged in a campaign of lies and misinformation by stating that Plaintiff's doctor had been contacted, when he had not, and allowed USPS workers to berate Plaintiff because of his physical handicap. Plaintiff also complains that Defendant placed him on AWOL status and threatened him with discharge in violation of the collective bargaining agreement.

In pursuing a Title VII retaliation claim, Plaintiff bears the initial burden of establishing a prima facie case by showing: 1) he was engaged in opposition to Title VII discrimination; 2) he was subjected to adverse employment action; and 3) a causal connection existed between the protected activity and the adverse employment action. *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998). With regard to conduct sufficient to rise to the level of a materially adverse employment action,

> [r]etaliatory conduct other than discharge or refusal to rehire is . . . proscribed by
> Title VII only if it alters the employee's "compensation, terms, conditions, or

16

> privileges of employment," or "adversely affect[s] his [or her] status as an employee." It follows that "not everything that makes an employee unhappy" qualifies as retaliation, for "[o]therwise, minor and even trivial employment actions that 'an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"

*Id.* (all but first alteration in original)(*quoting Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)(*quoting Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996))).

Defendant maintains that Mr. March cannot prove the second element of his prima facie case, adverse employment action, and the Court agrees. Neither Mr. Stout's statement in his letter to Mr. March on September 17, 1998, that Plaintiff's doctor agreed that he could return to work at the Plant with the use of protective goggles, nor comments by two coworkers at the AMF that Plaintiff was blind as a bat and the error rate was going to go sky high, rise to the level of an adverse employment action. Additionally, both of Plaintiff's grievances were settled, thereby negating any possible adverse effects caused by Defendant allegedly not abiding by previous agreements, attempting to force Plaintiff to return to work in violation of his medical restrictions, charging him with being AWOL, and threatening Plaintiff with discharge. Not only did Plaintiff never return to work at the Plant, but he agreed to report to the AMF. Plaintiff received all back pay and leave, all letters of warning were removed from his file, and he suffered no other adverse employment actions. To the extent Plaintiff attempts to assert retaliation by Defendant in allegedly failing to provide a reasonable accommodation, Plaintiff made no such claim in his Complaint and he has provided no argument or authority as to why such a claim should be considered at this point in the proceedings. In any case, as the Court has determined that Mr. March has not established that he is entitled to the protections of the Rehabilitation Act, Defendant was under no obligation to provide such accommodation.

An Order in accordance with this Memorandum Opinion shall be entered contemporaneously.

_____
**UNITED STATES DISTRICT JUDGE**